UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

ROBERT G. REINARD, III,
                    Plaintiff,                          09-CV-0508A

              v.                                        DECISION
                                                       and ORDER
MICHAEL J. ASTRUE,
Commissioner of Social Security,

                    Defendant.

_____

## INTRODUCTION

Plaintiff Robert G. Reinard, III ("Plaintiff") brings this action pursuant to section 405(g) of the Social Security Act, seeking review of a final decision of the Commissioner of Social Security ("Commissioner"), denying his application for Supplemental Security Income ("SSI") Benefits. Specifically, Plaintiff alleges that the decision of Administrative Law Judge ("ALJ") Robert T. Harvey denying his application for benefits was based on legal error and was not supported by substantial evidence contained in the record.

The Commissioner moves for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, on the grounds that substantial evidence in the record supports the Commissioner's final decision. Plaintiff opposes the Commissioner's motion, and cross-moves for judgment on the pleadings, on the grounds that the ALJ failed to apply the correct legal standards and that his decision was not based on substantial evidence.

For the reasons set forth below, I find that the Commissioner's decision was contrary to applicable legal standards and not supported by substantial evidence in the record as a whole. I hereby deny the Defendant's motion for judgment on the pleadings, grant the Plaintiff's motion for judgment on the pleadings and remand this claim to the Commissioner for further proceedings consistent with this decision: immediate calculation and payment of benefits.

## BACKGROUND

On February 12, 2007, Plaintiff Robert G. Reinard, III protectively filed an application for SSI benefits, alleging disability since his birth on December 12, 1987, due to congenital heart disease, protein losing enteropathy ("PLE"), scoliosis, and learning disabilities. (T. 132). The claim was initially denied on June 8, 2007. (T. 55). Thereafter, the Plaintiff timely filed a written request for hearing on June 28, 2007. (T. 61). Counsel for the Plaintiff submitted further evidence for the record on November 12, 2008. (T. 318-351). The Plaintiff appeared and testified at a hearing held November 12, 2008 in Buffalo, NY. (T. 22-53).

In a decision dated November 26, 2008, ALJ Robert T. Harvey found that the Plaintiff had the residual functional capacity ("RFC") to perform a full range of sedentary work and was not disabled. (T. 11-21). The Appeals Council denied review on March 25, 2009, rendering the ALJ's decision the final decision of the

Commissioner. (T. 5-9). The Plaintiff filed this action on May 27, 2009.

## DISCUSSION

## I. Jurisdiction and Scope of Review

Title 42, Section 405(g) of the United States Code grants jurisdiction to Federal District Courts to hear claims based on the denial of Social Security benefits. See Mathews v. Eldridge, 424 U.S. 319, 320 (1976). In addition, Section 405(g) directs that the District Court must accept the Commissioner's findings of fact if those findings are supported by substantial evidence in the record. See Bubnis v. Apfel, 150 F.3d 177, 181 (2d Cir. 1998); see also Williams v. Comm'r of Soc. Sec., 2007 U.S. App. LEXIS 9396, at *3 (2d Cir. 2007). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." See Metropolitan Stevedore Co. v. Rambo, 521 U.S. 121, 149 (1997) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). The Court must "scrutinize the record in its entirety to determine the reasonableness of the decision reached." Lynn v. Schweiker, 565 F. Supp. 265, 267 (S.D. Tex. 1983) (citation omitted). Section 405(g) thus limits this court's scope of review to two inquiries: (I) whether the Commissioner's conclusions are supported by substantial evidence in the record as a whole, and (ii) whether the Commissioner's conclusions are based upon an erroneous legal standard. See Green-Younger v. Barnhart, 335 F.3d 99, 105-06 (2d Cir. 2003); see also Wagner v. Secretary of Health

& Human Serv., 906 F.2d 856, 860 (2d Cir. 1990) (holding that review of the Secretary's decision is not *de novo* and that the Secretary's findings are conclusive if supported by substantial evidence).

Both Plaintiff and Defendant move for judgment on the pleadings pursuant to 42 U.S.C. 405(g) and Rule 12(c) of the Federal Rules of Civil Procedure. Section 405(g) provides that the District Court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C.S. § 405(g) (2007). Under Rule 12(c), judgment on the pleadings may be granted where the material facts are undisputed and where judgment on the merits is possible merely by considering the contents of the pleadings. See Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639, 642 (2d Cir. 1988). A District Court should order payment of SSI benefits in cases where the record contains persuasive proof of disability and remand for further evidence would serve no purpose. See Carroll v. Secretary of Health and Human Serv., 705 F.2d 638, 644 (2d Cir. 1981). The goal of this policy is "to shorten the often painfully slow process by which disability determinations are made." Id. Because this court finds that (1) the ALJ's decision was not supported by substantial evidence and (2) the record contains substantial evidence of disability such that further evidentiary proceedings would serve

-4-

only to prolong the process, judgment on the pleadings is granted for the Plaintiff.

## II. **<u>The ALJ's determination that plaintiff is not disabled is not supported by substantial evidence and contains errors of law</u>**.

In finding that the Plaintiff was not disabled within the meaning of the Social Security Act, the ALJ adhered to the Social Security Administration's five-step sequential analysis for evaluating applications for SSI. <u>See</u> 20 C.F.R. § 404.1520 and 416.920(a)(4)(i)-(v)(2009).[1] Under step one of that process, the ALJ found that the Plaintiff had not been engaged in substantial gainful activity since February 12, 2007, the application date. (T. 16). At steps two and three, the ALJ found that the Plaintiff's impairments from "status post spinal surgery in 2004 with placement of a Harrington rod, complex congenital heart disease, protein losing enteropathy, scoliosis, and a learning disorder," were severe within the meaning of the Regulations but were not severe enough to meet or equal, either singly or in combination, any of the impairments listed in Appendix 1, Subpart P of Regulations No. 4. (T. 16-18). At step four, the ALJ determined that the Plaintiff had no past relevant work but that he had "the residual

---

[1] Pursuant to the five-step analysis set forth in the regulations, the ALJ, when necessary, will: (1) consider whether the claimant is currently engaged in substantial gainful activity; (2) consider whether the claimant has any severe impairment or combination of impairments which significantly limit his physical or mental ability to do basic work activities; (3) determine, based solely on medical evidence, whether the claimant has any impairment or impairments listed in Appendix 1 of the Social Security Regulations; (4) determine whether or not the claimant maintains the residual functional capacity to perform his past work; and (5) determine whether the claimant can perform other work. <u>See</u> <u>id</u>.

functional capacity to lift/carry 10 pounds, sit 2 hours in an 8 hour day and stand/walk 6 hours in an 8 hour day," with "occasional limitations in bending, climbing, stooping, pushing/pulling with the upper extremities." (T. 18, 20). At this step, the ALJ also found that the Plaintiff could not work in areas with unprotected heights, or around heavy, moving or dangerous machinery and that he could not do any climbing of ropes, ladders or scaffolds. Id. Additionally, the ALJ established that the Plaintiff had "occasional limitations in the ability to understand, remember and carry out detailed instructions." Id. In step five of the analysis, the ALJ determined that the Plaintiff had the residual functional capacity to perform "a full range of sedentary work," as his "additional limitations ha[d] little or no effect on the occupational base of unskilled sedentary work." (T. 20). Using his step five findings, the ALJ referred to the grids in 20 C.F.R. Part 404, Subpart P, Appendix 2 ("the grids") and used the Medical-Vocational Rules to direct a finding of not disabled under Rule 201.27. Id.; (20 C.F.R. Pt.5 404, Subpt. P, App. 2.)

The Commissioner argues that the ALJ's determination, that the Plaintiff is not disabled, is supported by substantial evidence in the record. The Plaintiff, however, has three main objections. (Pl. Memorandum of Law ("Pl. Mem."), 15-25). First, he argues that the ALJ "erred in failing to utilize a vocational expert when determining that the Plaintiff was not disabled." (Pl. Mem., 15-17). Second, the Plaintiff contends that the ALJ "failed to accord

proper weight to the evidence provided by his treating physicians."
(Pl. Mem., 17-19). Finally, he maintains that the ALJ "erred in
finding the Plaintiff's testimony regarding his symptoms not fully
credible." (Pl. Mem., 19-24).

**A. The ALJ's use of the grids in Appendix Two was legal error.**

Where the ALJ has determined, as is the case here, that the
claimant is unable to perform his past work, the burden is on the
Commissioner to demonstrate that the claimant is still able to
perform "some less demanding, but gainful, employment." Rinker v.
Chater, 1997 U.S. Dist. LEXIS 1127 at *13 (citing Ferraris v.
Hecker, 728 F.2d 582, 584 (2d Cir. 1984) (citations omitted)). In
making this determination of disability, an ALJ must consider a
claimant's residual functional capacity, age, education, and work
experience. 20 C.F.R. 416.920(g). Here, the ALJ determined that the
Plaintiff had the residual functional capacity to perform a full
range of sedentary work, because his "additional limitations ha[d]
little to no effect on the occupational base of unskilled sedentary
work." (T. 20). Based on this assessment, the ALJ used the Medical-
Vocational Rules found in the grids to direct a finding of "not
disabled" under Rule 201.27. Id.; 20 C.F.R. Pt. 404, Subpt. P, App.
2. Both the ALJ's conclusion concerning the Plaintiff's ability to
perform a full range of sedentary work and his use of the grids
were not supported by substantial evidence in the record.

The ALJ found at step two of the evaluation process that the
Plaintiff only has the residual functional capacity to sit for two

hours in an eight hour day.[2] (T. 18). To be able to perform a full range of sedentary work, a claimant must be able to sit for six hours in an eight hour day. SSR 96-9p. If not, the occupational base of sedentary work is considered "eroded," and it is not proper for an ALJ to rely on the grids. SSR 96-9p; <u>Lugo v. Chater</u>, 932 F.Supp. 497, 501 n.1 (S.D.N.Y. 1996)("where a claimant cannot perform a full range of sedentary work, he must be evaluated individually rather than by a mechanical application of the grid rules"). Based on his own determinations regarding the Plaintiff's residual functional capacity, the ALJ's conclusion that the Plaintiff can perform a full range of sedentary work is flawed. Based on the medical evidence in the record, he should have consulted a vocational expert or similar source in order to obtain an individualized opinion. <u>See</u> <u>Bapp v. Bowen</u>, 802 F.2d 601, 604 (2d Cir. 1986) ("the grids should only apply where they 'adequately reflect a claimant's condition'").

## B. The ALJ failed to properly apply the treating physician rule.

The ALJ's disability decision is also flawed because of his failure to give controlling weight to the opinion of the Plaintiff's treating cardiologist, Dr. Pieroni. Moreover, the ALJ did not consider the Plaintiff's restriction to part-time employment despite a record replete with references to this

---

[2] A residual functional capacity ("RFC") "is the individual's maximum remaining ability to perform sustained work on a regular and continuing basis; i.e. 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-9p.

limitation. In a report dated April of 2006, Dr. Pieroni described Robert's work limitations to the New York State Vocational and Educational Services for Individuals with Disabilities ("VESID"), which restricted the Plaintiff to working a maximum of four hours per day, six days per week because of his heart related symptoms. (T. 213-214). Dr. Pieroni, in the same report, stated that "patient has severe cardiac abnormality: Single ventricle complex . . . required three surgeries . . . developed Protein Losing Enteropathy . . . prognosis of condition . . . life." The regulations specify that "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) will be given 'controlling weight' if the opinion is 'well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record.'" Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003)(citing 20 C.F.R. 404.1527(d)(2); Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000); Rosa v. Callahan, 168 F.3d 72, 78-79 (2d Cir. 1999)).

As Dr. Pieroni's opinion is well supported by clinical evidence and is not contradicted by other medical evidence in the record, his opinions regarding the Plaintiff's restrictions resulting from his heart condition - Single Ventricle Complex and Coarctation of the Aorta post Fontan Procedure[3] - and its rare side

---

[3] Single Ventricle (a.k.a. Common Ventricle) is a congenital heart defect where both of a person's atrioventricular valves enter into a common ventricle, the other ventricle is missing or non-functional. The Ventricles

effect - Protein Losing Enteropathy ("PLE")[4] - should have been given controlling weight. See Sarchese v. Barnhart, 202 U.S. Dist. LEXIS 13700 at *7-8(citing 20 C.F.R. 404.1527(d)(2)). Dr. Pieroni has been the Plaintiff's treating cardiologist since his heart condition was diagnosed in infancy. (T. 135, 158, 164, 217-219, 239-247). His opinions are based on clinical evidence including echocardio/Doppler reports and longstanding, regular physical exams. Id. He monitored the Plaintiff's heart condition through two open-heart and one closed-heart surgeries, and the resulting PLE.[5] Id. He is the prescribing physician for medication related to the Plaintiff's heart condition and his PLE. (T. 166). Moreover, as a pediatric cardiologist, he is uniquely qualified to opine as to the diagnosis, treatment and prognosis of plaintiff's condition. (T. 349-244). See 20 C.F.R. §404.1527(d)(4) (SSA generally gives more weight to the opinion of specialists).

Furthermore, the record reveals that Dr. Pieroni opined that the Plaintiff should be limited from any extended exertion activity and from heavy lifting, stating at one point that while he could

---

[4] are the pumping chambers of heart - normally the left pumps blood to the body, the right to the lungs. Coarctation of the Aorta is a narrowing of the descending aorta. The Fontan procedure is a pallative measure that channels the blood returning from the body to the lungs in a passive fashion without the use of a ventricle, this is performed on patients who have only one morphological or functional ventricle to avoid overworking the single ventricle. See Medcyclopaedia Online.

[5] Although the PLE improved enough to be classified as Low Grade following the 3rd heart surgery in the Fontan Procedure, it returned to symptomatic levels following his scoliosis surgery and required "vigorous therapy." (T. 218). It had receded as of May 2006, but Dr. Pieroni expressed concern that it would return with a proposed hernia surgery. Id.

participate in gym class with the above restrictions, he must be able to rest as needed.[6] (T. 240) In December 2006, Dr. Pieroni reported to the Plaintiff's school that he believed the Plaintiff to be completely and permanently disabled, due to a severe congenital cardiac anomaly and long term cardiac problems from PLE, a rare but serious side effect. (T. 235).

In addition, the four-hour restriction was brought up by Plaintiff's counsel in the hearing and was confirmed by the Plaintiff. (T. 43). Initially, in response to a series of questions, the Plaintiff denied "problems with stamina," however, he later testified that he was "trying to get [his stamina] back up. (T. 36). Also, when asked specifically about work he responded that working "just kicks the crap out of [him]" after four hours. (T. 33, 43). He testified that he could work for a day but that he would then need to take off a few days because of his health problems. (T. 40). See Sarchese v. Barnhart, 202 U.S. Dist. LEXIS 13700 at *21 (citing 56 Fed. Reg. at 57,939) (noting that the SSA specifically added fatigue as a symptom that needs to be assessed "to avoid any misinterpretation").

Plaintiff's inability to work for a full eight hour day is further discussed in reports from his vocational training

---

[6]In May 2006, he wrote to the Plaintiff's primary care physician specifically about the Plaintiff's heart condition and stated concerns about the most recent cardiac evaluation, but did not "restrict his activity." (T. 218-219). This letter, read in context, is not directly contradictory as it addresses his most recent echocardiogram and is not specific to the Plaintiff's ability to perform work-related activity, unlike the RFC report Dr. Pieroni submitted to VESID one month earlier. (T. 214, 219).

experiences. VESID counselor Cindy Malzan referred the Plaintiff for supported employment services. (T. 255-269). In a Supported Employment Case Note she noted "due to impairment the consumer is limited in endurance, [and] requires frequent and/or extended absences from job: is unable to sustain a consistent work effort over a course of a typical 8 hour day." Nevertheless, the Plaintiff tried a number of situational assessments which reported good to adequate work when present but noted fatigue or problems with absenteeism due to illness. (T. 141-144, 324, 325). Even with a modified schedule of working four hours every other day, Allentown Industries (where the Plaintiff was involved in a supported employment program) terminated the Plaintiff for absenteeism after he called in and followed proper procedure for nine absences but failed to call in for one. (T. 326-28, 337, 345).

Furthermore, the ALJ fails to provide any consultative medical evidence that contradicts either the Plaintiff's own statements regarding his part-time limitation or Dr. Pieroni's opinion. The ALJ gave "some weight" to the opinion of consultive examiner Dr. Kathleen Kelley. (T. 19). He notes that Dr. Kelley opined that the Plaintiff had mild limitations bending head forward towards his feet due to spine instrumentation and that he should avoid heavy lifting, contact sports and endurance activities. Id. However, Dr. Kelley actually stated "he had difficulty with any flexion of the cervical spine" and that he would have mild limitations due to his "inability to lower his head and look at his feet due to

-12-

instrumentation of the spine." (T. 284). She noted abnormalities in his heart exam writing that the exam was "very difficult to do...[and that she] would really have to defer to a cardiologist." (T. 282). She did not give an opinion as to the Plaintiff's ability for sustained activity or even opine with regards to his ability to sit or stand for extended periods. (T. 279-284).

"[The ALJ] may not select and discuss only that evidence that favors [his] ultimate conclusion...where items of pertinent weight have been missed, [the ALJ's] decision should not be upheld". New York ex. Rel. Bodnar v. Secretary of Health and Human Services, 903 F.2d 122, 126-127 (2d Cir. 1990). The ALJ should have afforded the opinions of Dr. Pieroni controlling weight as they were supported by clinical evidence and not contradicted in the record. Even more troubling is that the ALJ did not even indicate what weight he credited Dr. Pieroni's opinion. He did afford "some weight" to the opinion of consultative examiner, Dr. Kathleen Kelly, even though she could not adequately assess the claimant's cardiac condition and she would need to defer to a cardiologist. See Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999). "Failure to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand."

The ALJ also improperly dismissed the testimony of both of the Plaintiff's former and current primary care physicians. (T. 19). The ALJ dismisses the testimony of Dr. Dorothy Downey, affording it "little weight," because she "last saw the claimant in 2006."

(T. 19). Dr. Downey was the Plaintiff's pediatrician, who saw him in her office from infancy to the age of 18. (T. 249). Dr. Downey opined that the Plaintiff had experienced problems with fatigue and that she was aware of limitations of his physical activity but could not opine as to the specific duration or weight of those limits. (T. 251-252). Nevertheless, her opinions were based on a longstanding patient-physician relationship and do not contradict other limitations noted in the record.[7] Dismissing the opinions of a treating pediatrician of 18 years simply because the Plaintiff turned 18 and left to be treated by another physician because he was an adult was error without considering other relevant factors. Schaal v. Apfel, 134 F.3d 496, 503 (2d Cir. 1998)(citing 20 C.F.R. §§404.1527(d)(2), 416.927(d)(2))). Especially since she opined that the expected duration of the Plaintiff's prognosis and condition was life. (T. 250).

Similarly improper, was the decision to afford "little weight" to the opinions of Dr. Prada Luther, the Plaintiff's current primary care physician simply based on the Plaintiff's testimony

---

[7]   In deciding whether to give the treating physician's opinion controlling weight the ALJ must consider the following factors: "(i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors. Schaal v. Apfel, 134 F.3d 496, 503 (2d Cir. 1998) (citing 20 C.F.R. §§404.1527(d)(2), 416.927(d)(2)).  Then, "[a]fter considering the factors, the ALJ must 'comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion.'" Burgess v. Astrue, 537 F.3d 117, 129 (2d Cir. 2008). Remand is appropriate where the ALJ fails to provide "'good reasons' for not crediting the opinion of a claimant's treating physician." Id. at 129-30 (citing Snell, 177 F.3d at 133(citing 20 C.F.R. §§404.1527(d)(2), 416.927(d)(2)).

that he saw Dr. Luther three times, each visit lasting five minutes. (T. 19). The ALJ concluded from a series of questions during the hearing that there was "no longitudinal treatment history," and therefore afforded Dr. P. Luther's opinions "little weight." (T. 19). Again, the record reveals that the Plaintiff began seeing Dr. P. Luther when he was nineteen after he left his pediatrician, Dr. Downey. (T. 330). Dr. Luther opined in November 2007, that the Plaintiff could lift no more than ten pounds and could not work more than four hours in a day, twenty hours a week. (T. 329-31). Moreover, this dismissal of the current treating physician's opinions as having little weight, combined with the similar dismissal of the Plaintiff's pediatrician's opinion, who combined treated him continually since infancy, is particularly egregious. It leaves the Plaintiff without the benefit of the opinion of a primary care physician simply because he progressed from his pediatrician to a family care practitioner at the age of 18.

**C. The ALJ erred in finding the Plaintiff's testimony regarding his symptoms not fully credible.**

The ALJ found that claimant's statements regarding his symptoms and resulting limitations are "generally credible" but not to the extent alleged. (Tr. 19). He further stated that he "gave the claimant the benefit of the doubt concerning his frail condition and . . . assigned him to a sedentary residual functional capacity." (Tr. 19). Yet, the Court notes that although the ALJ

claims to "have considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the record," the ALJ failed to acknowledge or even consider a number of these subjective complaints in making his disability determination. (Tr. 18).

The ALJ acknowledged that the Plaintiff suffers from the "following severe impairments: status post spinal surgery in 2004 with placement of a Harrington Rod, complex congenital heart disease, protein losing enteropathy, scoliosis, and a learning disorder." (T. 16). These impairments and/or the medications taken to mitigate their effects could reasonably be expected to produce the symptoms that the Plaintiff describes -- particularly fatigue, shortness of breath, frequent urination, dizziness, diarrhea, pain and an inability to lower his head and look downward. (T. 132, 146, 148, 159).

The claimant, since infancy, has suffered from the effects of a defective heart as clearly articulated in Dr. Pieroni's reports and those of his other treating physicians. ALJ Harvey's decision ignores the Plaintiff's testimony regarding shortness of breath, frequent urination, and dizziness caused by his medications. (Tr. 31-32, 51). The exertion limitations documented by Dr. Pieroni regarding lifting, carrying, and climbing and his ability only to work up to four hours a day, six days a week are well documented in the record and supported by substantial evidence including Plaintiff's testimony that he could only work for four hours at a

time before he feels fatigued. (Tr. 213, 43). The uncontradicted diagnosis of Protein Losing Enteropathy (PLE) itself accounts for claimant's fatigue, frequent urination and diarrhea, three of his most severe limitations. PLE is a "rare but life-threatening complication after the Fontan Procedure." Luc Mertens, et. al., *Protein Losing Enteropathy After the Fontan Operation An International Multicenter Study*, THE JOURNAL OF THORACIC AND CARDIOVASCULAR SURGERY (May 2009). It is characterized by excessive loss of serum proteins (protein molecules in the blood stream) into the gastrointestinal tract. Common symptoms include: edema, ascites, pleural effusion, and chronic diarrhea. Less common side effects include: dyspnea, fatigue, abdominal fullness, carpopedal spasms and pericardial effusion. Serum protein diffusion may also place the patient at risk for infection and malnutrition. "Patients who develop PLE after the Fontan operation have a poor prognosis . . ." Id.

Along with fatigue and the Plaintiff's resulting limitation to a four-hour work day, the Plaintiff's complaint of frequent urination should have been taken into account. The Plaintiff testified that his abdomen would swell up with fluid and that for this reason he needed to take a diuretic, which caused him to urinate every 10 minutes. (T. 50-51). He also testified that this need interfered with his work day. (T. 51). His school records reflect his need for "unlimited lavatory privileges," and at one point the school psychiatrist noted "several bathroom breaks were

-17-

required during an evaluation." (T. 192, 208). Abnormalities in his abdomen were noted by Dr. Kelley (T. 282), and protuberance was noted by Dr. Downey. (T. 251). His mother wrote that his sleep was interrupted due to diuretics. (T. 146).

Incontinence and diarrhea are also symptoms that were not mentioned by the ALJ, but they are consistent with the Plaintiff's medical impairments and interfere with the Plaintiff's ability to work. The Plaintiff states that the incontinence and diarrhea cause him to "go to the bathroom and mess [on himself]." (T. 41). He also testified that this has caused problems on the job, caused him to call in sick and that this happens "more often than not." (T. 40-41). He would bring a bag to work containing boxers, wipes and pants to help prevent him from "getting sick." (T. 48, 336). The Plaintiff's primary care physician sent him to Dr. Ramesh Luther, a digestive health specialist, concerning the Plaintiff's symptoms of chronic diarrhea and incontinence. (T. 350-351). On October 2, 2008, Dr. R. Luther diagnosed the Plaintiff with poor anal sphincter tone and stated his impression that "continued cardiac problems...ascites, incontinence with poor anal sphincter tone, [and] protein losing enteropathy...cause[d] him to have problems with his bowels." (T. 350). Dr. R. Luther ordered more tests to determine further causes for the Plaintiff's gastrointestinal ("GI") problems, but wrote that since "[the Plaintiff] may need more help GI-wise than [he could] provide...[he] m[ight] refer him to a tertiary care center for further care." (T. 351). According to

the Plaintiff's testimony, he is supposed to see a GI-specialist at "Buff. State" as the next step in the plan of care. (T. 45-46).

The ALJ also did not mention the Plaintiff's complaint of dizziness in his opinion, despite the Plaintiff's testimony during the hearing that as a side effect of his medication he experienced dizziness as recently as "in the waiting room." (T. 31). He does not mention that the Plaintiff testified that he experienced shortness of breath with activity or inactivity. (T. 31). When the ALJ asked if bending, climbing, or stooping caused any problems, he testified these activities made it "hard to breathe..." (T. 31, 32). The ALJ also failed to note that the Plaintiff cannot bend his head forward enough to see his feet due to the Harrington Rods fused to his spine. (T. 284). Dr. Kelley confirmed this in her report noting that the Plaintiff would have some limitations in mobility due to his "inability to lower his head and look at his feet due to instrumentation of the spine." (T. 284). These limitations are consistent with the Plaintiff's congenital heart defect, his scoliosis and status post spinal surgery with the placement of Harrington Rods, and/or as a side effect of Lisinopril which the Plaintiff takes for his heart condition. (T. 16, 352).

The ALJ also failed to give good reason for discounting the Plaintiff's testimony concerning his subjective symptoms. The ALJ must consider specific factors listed in 20 C.F.R. §404.1529(c), including: (1) the claimant's daily activities; (2) the location, duration, frequency and intensity of the claimant's pain; (3) any

precipitating or aggravating factors; and (4) the type, dosage, effectiveness, and side effects of any medication taken by claimant to alleviate the pain. 20 C.F.R. § 404.1529(c)(3)(i)-(iv); 20 C.F.R. § 404.929(c)(3)(i)-(iv). Initially, the ALJ found that the "claimant's allegations of disability are inconsistent with her (sic) activities of daily living." (T. 19). At the hearing, the ALJ informed the Plaintiff that he was going to ask questions concerning his "activities of daily living." (T. 34) He then asked: "Do you clean at home?... Do you cook?...Do dishes?...etc." The Plaintiff responded with "yes" to each question. (T. 34-35). The ALJ failed to take into account that, even if the Plaintiff does perform the activities stated in his opinion (T. 19), other evidence in the record more than suggests he does not perform them on a regular and continuing basis - the standard which would allow an ALJ to use daily activities to negatively impact his credibility.[8] The Plaintiff need not be an invalid to be found disabled. Vasquez v. Barnhart, 2004 U.S. Dist. LEXIS 5606 (E.D.N.Y. Mar. 2, 2004)(citing Carroll v. Secretary of Health & Human Services, 705 F.2d 638, 643 (2d Cir. 1983)); See also Balsamo v.

---

[8] The Plaintiff acknowledged that he lived with his parents and that they provided food, shelter and clothing. (T. 24, 33). Testimony from his mother in the Function Report completed 6/4/07, suggests he does much less exertionally on a daily basis that the ALJ's interpretation of his testimony implies. (T. 145-152). Most specifically she wrote that the Plaintiff prepares soup, a sandwich, canned food or microwaveable meal, eats, showers, uses the computer, watches TV and listens to music from the time he wakes up to the time he goes to bed. (T. 146, 147). She also writes that the Plaintiff is not strong enough to push a lawnmower and that he cannot get too much sun because "too much sun makes him sick." (T. 19, 35, 148).

Chater, 142 F.2d 75, 81 (2d Cir. 1998) (quoting Williams v. Bowen, 859 F.3d 255, 260 (2d Cir. 1988) ("[A] claimant 'need not be an invalid to be found disabled' under the Social Security Act."); (T. 145-152). Also, when discussing the Plaintiff's daily activities, the ALJ stated that "[Plaintiff] began working out every other day in November 2008. (T. 19). Yet, the Plaintiff testified at his hearing on November 12, 2008 that "last week" he began working out "every other day," for "probably an hour," by doing "push-ups and stretching mostly" because he can't do sit-ups. (T. 36). The Second Circuit [has] frequently rejected determinations that a person is not disabled based on minimal activities of daily life not engaged in "for sustained periods comparable to those required to hold a sedentary job. Sarchese, 2002 U.S. Dist. LEXIS 13700 at *26 (citing Carroll v. Secretary of Health and Human Services, 705 F.2d 638, 643 (2d Cir. 1983)(other citations omitted)).

The ALJ also failed to consider how the Plaintiff's intellectual disability may have affected his testimony, even though the ALJ acknowledged that the Plaintiff had limitations in his ability to understand, remember and carry out detailed instructions. (Tr. 17). The ALJ found that "the claimant testified he could remember three different instructions without a problem." (Tr. 19). Yet, the actual conversation in the record went:

"ALJ: Do you have any difficulties with instructions?

Plaintiff: Nope.

ALJ: Okay. If someone was to give you three different instructions; take out the trash, sweep the floor and wash the dishes, could you remember those three?

Plaintiff: Nope.

ALJ: Okay...." (T. 26).

"Courts have condemned this type of misrepresentation of the record. Goldthrite v. Astrue, 535 F.Supp.2d 329, 338 (citing See Pagan on behalf of Pagan v. Chater, 923 F.Supp. 547, 555 (S.D.N.Y. 1996)).

The ALJ likewise failed to give good reason for dismissing the testimony of the consultive psychiatric evaluator, Dr. Thomas Ryan, Ph.D. (T. 19-20). The ALJ notes that Dr. Ryan "indicated that [the Plaintiff] would have difficulty with complex tasks...[and] listed the [Plaintiff's] diagnosis as a learning disorder." (T. 19). The ALJ also writes that Dr. Ryan listed "his prognosis as guarded given the nature of his condition - heart difficulties," and yet concludes from this that "little weight is assigned to this prognosis as Dr. Ryan is not an M.D., but a Ph.D." (T. 19). Dr. Ryan diagnosed Plaintiff's condition as follows: "Learning disorder, NOS; Heart difficulties; Scoliosis; Protein losing enteropathy." (T. 287). He also notes that the "results of [his] evaluation are consistent with psychiatric problems that may interfere to some degree on a daily basis" and recommends

vocational training.[9]  He concludes "Prognosis: Guarded given the nature of the condition." <u>Id</u>.

After reviewing the complete record, I find that the ALJ erred in not giving appropriate weight to the opinions of the treating physicians in determining the severity of the impairments sustained by the Plaintiff and I further conclude that there is substantial evidence in the record to support a finding that the Plaintiff is disabled within the meaning of the Act.

<b><u>CONCLUSION</u></b>

For the reasons set forth above, this court finds that the Commissioner's decision denying the Plaintiff disability benefits under SSI, was not supported by substantial evidence in the record and was based on legal error. The use of the grids was not appropriate in light of the Plaintiff's many and severely limiting exertional and non-exertional symptoms. The ALJ should have given controlling weight to the opinions of Dr. Pieroni, the Plaintiff's treating cardiologist. The Plaintiff's symptoms are consistent with the diagnoses provided by Dr. Pieroni and the Plaintiff's other treating physicians, Dr. Downey and Dr. Prada Luther.  The ALJ's conclusion that "the [Plaintiff's] additional limitations have

---

[9] Dr. Ryan found that plaintiff has "low average intellectual functioning...[with] a variability in skills suggesting a learning disability...difficulty with immediate recall...low average range in perceptual motor tasks...low average on task requiring him to identify familiar items in pictured objects." (T. 287). He also indicates that he is "slow paced" on clerical type tasks requiring speed and accuracy. <u>Id</u>. He finds that the Plaintiff can follow and understand simple directions, perform simple tasks, and maintain attention and concentration...[but that] [h]e may have difficulty with complex tasks. <u>Id</u>.

little or no effect on the occupational base of unskilled sedentary work" was erroneous. The record contains substantial evidence of disability such that further evidentiary proceedings would serve no purpose. Accordingly, the defendant's motion for judgment on the pleadings is denied and the plaintiff's motion for judgment on the pleadings is granted. The Commissioner's determination denying benefits is Vacated, and that this matter is Remanded to the Commissioner for calculation benefits.

**ALL OF THE ABOVE IS SO ORDERED.**

S/Michael A. Telesca

_____

Michael A. Telesca
United States District

DATED: July 13, 2010
       Rochester, New York